**MISSISSIPPI DEPARTMENT OF REHABILITATION SERVICES, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 03–2038C.**

United States Court of Federal Claims.

June 4, 2004.

Peter A. Nolan, Winstead, Sechrest & Minick, P.C., Austin, Texas, attorney of record for Plaintiff Mississippi Department of Rehabilitation Services.

Andrew P. Averbach, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for the Defendant. With him on the briefs were David M. Cohen, Director, Donald E. Kinner, Assistant Director, and Peter D. Keisler, Assistant Attorney General. Harriet Wright, Department of the Navy, Office of the General Counsel, of Counsel. David Turner, Department of the Navy, Office of the General Counsel, present at the hearing, for the Defendant.

Tahmineh I. Maloney, law clerk.

## *OPINION*

BASKIR, Judge.

Plaintiff, Mississippi Department of Rehabilitation Services (MDRS), brings this pre-award bid protest against the Department of the Navy (Navy) alleging that the Navy failed to afford blind persons the priority they are due under the Randolph–Sheppard Act, 20 U.S.C. §§ 107–107f (RSA or Act), in connection with solicitation No. N00140–03–R–1763 (RFP or solicitation). The solicitation at issue is for an award of a food services contract at the Naval Air Station in Meridian, Mississippi (NAS Meridian).

The Plaintiff and Defendant have filed Cross–Motions for Judgment Upon the Administrative Record. Because we conclude the request for proposals is for a contract "to operate" a food facility within the meaning of the RSA, **the Plaintiff's Motion for Judgment on the Administrative Record is** hereby granted and the Defendant's Cross–Motion is hereby denied.

## *Background*

### *The Randolph–Sheppard Act:*

Congress enacted the RSA in 1936 in order to enlarge economic opportunities for the blind, amending the Act twice, in 1954 and 1974. State and Federal agencies share responsibility in administering the Act. MDRS is the State Licensing Agency (SLA) for the State of Mississippi charged with carrying out the purposes of the RSA. Among other things, the Act provides that blind persons licensed by a SLA will be given priority in the operation of vending facilities on Federal property. 20 U.S.C. § 107(b). MDRS alleges that the RSA applies to the NAS Meridian solicitation, a contention that the Navy, through its Naval Supply Systems Command, rejects.

The Secretary of the United States Department of Education (DOE) administers the RSA, and has promulgated regulations through the DOE's Office of Special Education and Rehabilitation Service. 34 C.F.R. §§ 395.1–395.38. The regulations provide that "[p]riority in the operation of cafeterias by blind vendors on Federal property shall be afforded" when the Secretary, in consultation, determines that such operation "can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees." 34 C.F.R. § 395.33. Further, the appropriate state SLA "shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated." *Id.* If the SLA's proposal is judged within a competitive range, then the regulations' priority provisions come into effect and the property managing department must consult with the Secretary.

The Department of Defense (DoD) has also issued regulations implementing the RSA. 32 C.F.R. §§ 260.1–260.6. These regulations reaffirm that "the blind will be given a priority in award of contracts to operate cafeterias," on DoD controlled property. 32 C.F.R. § 260.3(b). This priority ensures that if the SLA's proposal is in the competitive range it will be awarded the contract, barring a determination that the award would be

adverse to the interests of the United States. 32 C.F.R. § 260.3(f). At issue in this matter is whether the Navy's solicitation calls for the "operation" of a cafeteria within the meaning of the RSA, thus triggering the Act's priority provisions.

Commissioners of the Rehabilitative Services Administration of the DOE (Commissioners) and the General Counsel of the DoD have issued interpretive opinions that serve to guide us in the application of the RSA. In March of 1992, then Commissioner Nell C. Carney issued a letter (Carney letter) to the Committee for Purchase from the Blind and Other Severely Handicapped (Committee) interpreting the phrase "operation of a cafeteria." He concluded that a contract met this standard if all but an insignificant portion of responsibilities was contracted out.

In January of 1999, then Commissioner Fredric K. Schroeder retracted this guidance because it was too limiting (Schroeder letter). Rather than offer a different measure by which to evaluate the contractor's role, he merely said—unhelpfully—that each solicitation should be evaluated on a case-by-case basis.

On November 12, 1998, DoD General Counsel Judith A. Miller issued an opinion reinforcing the DOE view that RSA applied in general to mess halls and other DoD eating facilities irrespective of their military name or character (DoD memo). Administrative Record (AR) at 412. She also made clear the RSA, in her words "trumps" other contracting preferences, such as set-asides under section 8(a) of the Small Business Act. She based her conclusions on her reading of the RSA, DOE guidance (the Carney letter) and Comptroller General opinions. While rejecting what we may call litmus tests or "definitional" distinctions, the memo cites to the Carney letter, but does not explicitly adopt it. It is with this regulatory backdrop in mind that we examine the Navy's solicitation.

*The Navy's solicitation:*

The facts of this case reveal a considerable history between MDRS and the Contracting Officer (CO), Mr. James O'Sullivan, regarding the applicability of the RSA to the NAS Meridian's dining facilities, going back to the award of an earlier contract in October of 1998.

A review of the correspondence between the parties during the earlier solicitation provides an interesting backdrop to the instant controversy. Mr. O'Sullivan has been firm in his view that the RSA does not apply to the NAS Meridian, with one brief exception. During the written debate between Mr. O'Sullivan and MDRS surrounding the first solicitation, an amendment to the solicitation was issued acknowledging that the RSA applied. Pl.'s Brief filed Jan. 27, 2004, at App. tab 15. This position was retracted, and a subsequent amendment was issued excluding RSA bidders on the basis of advice from the Department of the Army. *Id.*

At this time, Mr. O'Sullivan rested on what we may call a "definitional" argument. He reasoned that the NAS Meridian facility was a "galley," an "appropriated fund military dining facility" that was part of the military mission. It was not a "vending facility," and so was not covered by the RSA. Although MDRS contested this definitional exclusion, MDRS did not submit a bid for the 1998 contract, and for reasons we do not know, never insisted on its position by means of a bid protest.

The correspondence between the parties began anew in February of 2003, as the end of the initial contract approached. On February 13, 2003, MDRS, in anticipation of a new solicitation, sent a letter to the Navy expressing an interest in bidding. AR at 428. The letter asserted that the RSA affords MDRS a statutory priority in the operation of the NAS Meridian food service contract. It references statutes, case law and the DoD memo as support for its argument. The DoD memo explicitly rejects Mr. O'Sullivan's definitional approach: "the assertion that the Act does not apply to military dining facilities cannot withstand analysis." AR at 415. The memo states that the RSA is generally applicable to contracts involving military dining facilities, also rejecting a claimed exemption for those facilities involving appropriated funds.

On May 22, 2003, the CO responded to MDRS, again concluding that the RSA did

not apply to the food service contract at the NAS Meridian. AR at 431. Initially Mr. O'Sullivan posits "[t]his requirement is not a cafeteria, but rather, a DOD operated galley requiring DOD oversight," thus apparently resuscitating his earlier untenable position. But he offers a new rationale—"that the RSA does not apply to this requirement since DOD facilities and personnel continue to have the most important role in the overall day-to-day operation of this dining facility." In the words of the statute, the Navy "operates" the cafeteria and this is not a contract to "operate" the facility. Note that Mr. O'Sullivan now bases his position on the view that this was an RFP for separate services, with operational control remaining with the Navy.

On July 17, 2003, the Navy opened the solicitation for the contract, which was by its express terms limited to small business concerns, as a section 8(a) set-aside under the Small Business Administration Act. AR at 1–164. MDRS does not qualify as a section 8(a) entity. However, consistent with the DoD memorandum, the Government does not contend that it can exclude the coverage of the RSA simply by failing to cite it in an RFP.

On August 7, 2003, MDRS sent the CO a letter regarding the solicitation, this time enclosing a letter from the DOE concerning the NAS Meridian solicitation. AR at 432–35. The DOE letter, signed by Commissioner Joanne M. Wilson, rejected Mr. O'Sullivan's definitional argument "it doesn't matter whether the facility is called a mess hall, a cafeteria or a galley." AR at 434. However, it offered no conclusive opinion on the applicability of the RSA to the solicitation. Rather, Commissioner Wilson stated that "the applicability of the priority needs to be reviewed on a case-by-case basis," echoing the Schroeder letter. AR at 435. Because the DOE did not have a copy of the RFP, it could not offer a more definitive view. MDRS did not receive a reply to its latest letter until after the solicitation's close.

The day before the RFP closed, on August 18, 2003, MDRS submitted a bid. On August 29, 2003, Mr. O'Sullivan sent MDRS a letter concluding that the RSA did not apply to the solicitation, and therefore MDRS' bid would not be evaluated. AR at 437–38. The letter restated Mr. O'Sullivan's view that the Navy would be retaining operational control of the facility and therefore the Act did not apply.

This protest was filed on September 3, 2003. We have previously rejected the Government's argument that the bid protest was untimely. *Miss. Dep't of Rehab. Servs. v. United States,* 58 Fed.Cl. 371 (2003). The Navy has taken no action on the bids pending resolution of this litigation.

### Discussion

*Standard of review:*

This Court has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996 (ADRA). Pub.L. No. 104–320, 110 Stat. 3870. The ADRA directs reviewing courts to follow the standard of review set forth in section 706 of title 5 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. *See* 28 U.S.C. § 1491(b). Under the APA standard of review relevant to this matter, our inquiry is limited to whether the Navy's procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *e.g., Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000). As the reviewing Court, we "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

We may set aside a bid award if "either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1331–32 (Fed.Cir.2001). The test for a challenge brought on the first ground is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332–33 (citations omitted).

When a challenge is brought on the second ground, as in this matter, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice, the protestor must show there was a "substantial chance" it would have received the contract award, absent the alleged violation. *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999).

▉ In this case, the determining question has to do with the proper statutory meaning of the phrase "blind persons licensed under the provisions of this Act...shall be authorized to *operate* vending facilities on any Federal property." 20 U.S.C. § 107(a) (emphasis added); *see also* 20 U.S.C. § 107(b) (giving priority to blind persons licensed by a SLA in such operations). Crucial to the answer to this question is whether the CO's interpretation is afforded deference. We conclude it is not.

The Government argues that this Court must apply a deferential standard to the CO's interpretation. The CO interpreted the statutory term "operate" as it applies in the context of the RSA in a manner that foreclosed the Act's application to the Navy's solicitation. The Government claims this conclusion was "reasonable," essentially importing the "arbitrary and capricious" or discretionary tests for contracting officer decisions. The Government we note, makes no claim for *Chevron* deference for the CO's legal determination, recognizing that it is the DOE, not DoD, which is charged by Congress with responsibility for administering the RSA. *See generally Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Government is certainly correct that many CO decisions in the procurement process need only be "reasonable," if by that we mean not arbitrary or capricious. But the interpretation of statutes is a legal matter for courts to decide, and contracting officers can claim no special expertise in statutory construction. *See* 5 U.S.C. § 706; *see generally Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312 (Fed.Cir.2003) (where a bid protestor claimed that the Air Force violated applicable statutes and regulations

the Court reviewed the question of statutory interpretation *de novo* ); *but see Wash. State Dep't of Servs. for the Blind v. United States,* 58 Fed.Cl. 781 (2003). Other courts ruling on the meaning of statutory terms contained within the RSA have analyzed the meaning of those terms *de novo. See, e.g., NISH v. Cohen,* 247 F.3d 197 (4th Cir.2001). The proper role of courts is to confirm by "independent analysis" that the contracting officer's application of the RSA is both "permissible and correct." *Id.* at 206.

An additional problem with the Government's position is that the DOE, not the Navy, is the agency charged with administering the RSA. We are confronted with questions that involve the DOE's construction of the RSA, a statute which it administers, implicating issues of deference to the DOE. *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). Therefore, we review the Navy's construction of the RSA *de novo.* The Government perhaps recognizes that this might indeed be a *de novo* matter for the courts having so described the district court review of a DOE arbitration panel decision on this question as "*de novo.*" Def.'s Br. filed Jan. 27, 2004, at 21, citing *Louisiana Office of Rehab. Servs. v. United States Dept. of Air Force,* Civ. No. 98–1392 (W.D.La.2000) (memorandum ruling).

*Standing:*

In order to establish standing, MDRS must show that it is an "interested party" within the meaning of 28 U.S.C. § 1491(b)(1). The Federal Circuit has held that an "interested party" is an "actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *AFGE, Local 1482 v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001).

Although the Government does not raise the point, MDRS readily meets the "interested party" standard. MDRS submitted a bid, which the Navy did not evaluate. Should the Navy evaluate MDRS' bid affording it RSA priority, it would have a "substantial chance" of receiving the award, meeting both the

requirement for standing and prejudice. *See Alfa Laval Separation Inc.*, 175 F.3d at 1367. *The applicability of the RSA to the Navy's solicitation:*

These preliminaries having been completed, we now turn to the decisive question in this case, the meaning of the "operative" statutory provision, which reads in full as follows:

> For the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this Act...shall be authorized to *operate* vending facilities on any Federal property.

20 U.S.C. § 107(a) (emphasis added). The Navy's position is that the NAS Meridian solicitation does not call for the operation of a cafeteria within the meaning of the Act. In his letter of August 29, 2003, the CO explained:

> [E]ven if the Meridian galley were considered a "vending facility" within the meaning of the Randolph–Sheppard Act, it continues to be *operated by* the Navy, which, under the referenced procurement, will contract for various discrete services in support of its operation of that galley. The Navy has no plans to *authorize the operation of* that facility by a Randolph–Sheppard Act vendor or any other Contractor; the Navy will retain operational control of the galley. Accordingly, the solicitation is not for the operation of the Galley but, rather, is for discrete services in support of the Navy's operation of that facility. As such, the Randolph–Sheppard Act does not apply.

AR at 437–38 (emphasis in original). Note that Mr. O'Sullivan cannot resist resurrecting the old definitional argument—"even if the Meridian galley were considered a 'vending facility' "—but that it is not the basis for his decision.

In order to interpret the terms "operate" and "operation" we begin with an analysis of the language of the statute itself. *See, e.g., Info. Tech. & Applications Corp.*, 316 F.3d at 1320. "If the statutory language is plain and unambiguous, then it controls, and we may not look to the agency regulation for further guidance." *Id.*, citing *Chevron U.S.A., Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778.

The RSA mandates that the blind shall be given a priority in the operation of cafeterias. *See* 20 U.S.C. § 107(b); *see also* 34 C.F.R. § 395.1(x) (defining vending facilities to include cafeterias). Neither the Act nor the regulations define the terms "operate" and "operation." *See* 20 U.S.C. § 107(e) (defining terms used in RSA); *see also* 34 C.F.R. § 395.1 (defining terms used in the regulations). We then may assume the terms have their ordinary, established meanings, for which we may consult dictionaries. *See, e.g., Info. Tech. & Applications Corp.*, 316 F.3d at 1320. Additionally, we benefit immeasurably from Judge Hewitt's extensive and characteristically thorough analysis of the meaning of these terms. *Wash. State Dep't of Servs. for the Blind*, 58 Fed.Cl. at 789–90.

The Oxford English Dictionary defines "operate," in the relevant sense, as "[t]o direct the working of; manage; conduct, work (a railway, business, etc.)." O.E.D. Online (2d ed.1989). Moreover, Judge Hewitt instructs us on the significance of the use of the term in its transitive sense:

> 'To operate' is used in 20 U.S.C. § 107(a) as a transitive verb ('to operate vending facilities'). When used as a transitive verb, 'to operate' has distinctive meanings: '1. To control the functioning of; run... 2. To conduct the affairs of; manage ....' The American Heritage Dictionary of the English Language 1233 (4th ed.2000). The phrase 'to operate vending facilities' in 20 U.S.C. § 107(a) therefore connotes a distinctly executive function.

*Wash. State Dep't of Servs. for the Blind*, 58 Fed.Cl. at 789. "The term 'operation,' appearing in both 20 U.S.C. §§ 107(a), (b) and 34 C.F.R. § 395.33, however, is far more protean and malleable." *Id.* at 790. "Operation," in the relevant sense, is defined as, "[a] business transaction, esp. one of speculative character...Also more generally, a business activity or enterprise." O.E.D. Online (2d ed.1989).

With these definitions in mind, we first examine the DOE's interpretation letters. The Defendant and Plaintiff both urge this Court to apply *Chevron* deference to the DOE's interpretation of the meaning of "operation," contained in the Commissioners' letters. *See Chevron U.S.A., Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. Because the RSA does not speak clearly to the meaning of "to operate," it is proper for this Court to look to the DOE's interpretation of those terms. *See, e.g., Barnhart v. Walton,* 535 U.S. 212, 217–18, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

■ Courts are bound by agency-developed regulations issued pursuant to an express Congressional delegation of authority to elucidate a specific provision of a statute. *See generally Chevron U.S.A., Inc.,* 467 U.S. 837, 104 S.Ct. 2778. An agency's interpretation of a statutory provision is accorded *Chevron* deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Granting an agency power to engage in adjudication or notice-and-comment rulemaking are both indications of such Congressional intent. *Id.* at 227, 121 S.Ct. 2164.

■ However, where an agency has issued an interpretive ruling without the benefit of "notice and comment" procedures, a court may treat the agency's guidance as persuasive evidence. *Id.* at 236, n. 17, 121 S.Ct. 2164. "Interpretations such as those in opinion letters...do not warrant *Chevron* style deference." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Opinion letters are entitled to respect but only to the extent that they have the power to persuade. *Id.; see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). An agency's interpretation merits a degree of deference commensurate with the specialized experience of the agency and the value of uniformity in its administrative and judicial understandings of what national law requires. *See Mead,* 533 U.S. at 234, 121 S.Ct. 2164.

■ We concur with Judge Hewitt in her determination that the DOE interpretation of "operation" of a cafeteria is afforded deference under *Mead. Wash. State Dept. of Servs. for the Blind,* 58 Fed.Cl. at 786, n. 7; *but see NISH v. Rumsfeld,* 348 F.3d 1263, 1271 (10th Cir.2003) (affording *Chevron* deference).

Questions of deference now settled, we next turn to the opinion letters. Unfortunately, at the end of this exercise, we find that they offer little in the way of guidance. Issued on March 13, 1992, the Carney letter stated the DOE's position on the applicability of the Act to military troop dining facilities. While ultimately deciding that the determination needs to be made on a "case-by-case-basis," Commissioner Carney concluded that the RSA applied when the provision of food services involved a wide variety of functions and military personnel played a very limited or no role in the overall functioning of the food facility.

■ The Carney letter was rescinded on January 27, 1999, by a letter issued by then Commissioner Schroeder. The Schroeder letter states, in pertinent part, that the Carney letter was "too limiting" given the purposes of the Act. Moreover, the DOE was "in the process of reexamining the issue of what food services on military bases constitute the operation of a cafeteria under the Act." In the interim, questions would be assessed on a case-by-case basis.

Despite the DOE's indication in 1999 that it was "reexamining" its policy, it appears, on the basis of the record, that it has not issued any pronouncements on the matter since the Schroeder letter. As an interpretative guide, the Carney letter had the virtue of offering a readily applicable rule—the RSA applied only when all but an insignificant function was being contracted out. Except for rejecting this test, the Schroeder letter gives us no rule of thumb.

Our last bit of RSA guidance can be found in the letter dated August 8, 2003, from Commissioner Wilson. AR at 434–35. She responded to MDRS' inquiry regarding the

applicability of the RSA to the NAS Meridian solicitation. Commissioner Wilson reaffirmed that decisions of priority needed to be made on a case-by-case basis. But she stated "there is not sufficient information provided in your letter, the Navy's letter, or in the presolicitation notice to make a definitive determination on this issue at this time." AR at 435. Although MDRS had solicited DOE's views in connection with the RFP, and forwarded those views to Mr. O'Sullivan, MDRS notably did not send DOE the RFP. Having examined the DOE letter, we find it does little more than proffer that a case-by-case analysis is appropriate.

We next look to cases interpreting the meaning of "operation" of a cafeteria under the RSA. In *Louisiana Office of Rehabilitation Services,* the district court upheld an arbitration panel's determination that the solicitation at issue was not for the operation of a cafeteria. Civ. No. 98–1392. Reviewing the meaning of "operation of a cafeteria" *de novo,* the court afforded the position of the DOE, as expressed by the Carney letter, some deference. The court affirmed the panel's determination that the Air Force retained operational control of the cafeteria because it "(1) controlled food cost, (2) controlled food quality, and (3) was responsible for day-to-day supervision of the cafeteria." *Id.* at 7. The substance of the decision, unfortunately, is of no value, influenced as it is by the now rejected Carney test.

In a seemingly easy case, an arbitration panel concluded that the RSA did not apply to a "mess attendant" contract. *State of Alaska Dept. of Educ. Div. of Vocational Servs. v. United States Dept. of the Army,* Case No. RS/97/2 (Jan. 12, 2000) (Alaska). In *Alaska,* Army military personnel engaged in "all but the most mundane custodial work." *Id.* at 8–9. The Army selected the menus, cooked and served the food, ordered supplies, maintained quality control and cooking equipment. Based upon a review of the Carney and Schroeder letters, the arbitration panel applied the case-by-case standard. After a review of precedents and the DoD memo, the panel agreed with the Army's position and declined to apply the RSA.

Recently, Judge Hewitt upheld a CO's determination that the RSA did not apply to a contract for dining facility attendants. *Washington State Dept. of Servs. for the Blind,* 58 Fed.Cl. at 786. After a thorough consideration of the language of the RSA and its regulations, the legislative history of the Act, policy pronouncements by the DOE and several decisions by arbitration panels, the court upheld the determination that the contract for "dining facility attendants"—essentially busboy clean-up work like the *Alaska* contract—was not for the "operation" of the facility. In so ruling, the court applied the "arbitrary and capricious" standard, rather than a *de novo* review.

We may conclude that courts have not applied the RSA in cases where the contract is merely for busboy and other cleanup services. However, these cases have not clearly addressed the issue of what constitutes the "operation" of a cafeteria when the RFP at issue contracts out some, but not all, of those duties we would ordinarily ascribe to the "operation" of a cafeteria.

In order to determine who retains operational control of the NAS Meridian dining facility we, too, must examine the terms of the solicitation, comparing the duties assumed by the contractor with those retained by the Navy. In other words, we must conduct a case-by-case analysis just as Mr. O'Sullivan ostensibly did. But we come to a different conclusion.

If we reread Mr. O'Sullivan's letter of August 29, 2003, we can see it is cast in terms which clearly assert the Navy as the operator, and the RFP as simply seeking "discrete services in support of the Navy's operation of that facility." AR at 437–38. However, we are not concerned with "spin," but with reality. We look to what the RFP actually seeks from the contractor, and what functions it retains to the Navy. Generally, the functions required to conduct a typical cafeteria may be distilled as follows: menu and price determinations, food acquisition, food preparation, serving functions, cashier functions, cleaning services, quality control, day-to-day management and economic risk.

The actual duties to be assumed by the contractor are a great deal more extensive than Mr. O'Sullivan's text would indicate. The RFP's scope of work section lists the major functions to be performed by the contractor as follows: food preparation, cooking, baking and serving; cashier service; sanitation and housekeeping; and administrative work governing contracted functions. AR at 9.

The contractor is to "furnish managerial, administrative and direct labor personnel necessary for accomplishing all work required. . . . The workforce shall be supervised and trained to adequate levels at all times." *Id.* The personnel that the contractor must hire include: a general mess cash collection agent or authorized funds custodian; recordskeeper; bulk storeroom custodian; receipt inspector; cashier; control officer for the handling and security of the cash meal payment book; key control custodian; and hazardous material control officer. AR at 10. This is in addition to the other required positions of contract site manager, alternate contract site manager, baker, lead food service attendant, head cook, cook, food service worker and dishwasher, some positions potentially requiring more than one employee to fill. AR at 10–13. In addition to employees, the contractor must also provide some supplies and equipment, including cleaning and safety equipment. AR at 32–36.

Moreover, the contractor is required to develop and implement a training program and establish and maintain a complete "Quality Control Program." AR at 17. The Quality Control Program, to be approved by the CO, must contain an inspection system covering all services required by the contract, methods for identifying and preventing defects in the quality of services, an organizational structure, a method of documentation and a customer complaint program. *Id.*

The contractor also controls the day-to-day management of the cafeteria. After an initial period, in which the CO and the contractor meet at least weekly, meetings between the parties are only held as necessary. AR at 18. The tapering off of the CO's involvement in the operation leaves the contractor to assume unsupervised managerial control on a day-to-day basis.

The tasks retained by the Navy are as follows: the Navy establishes menus and provides all necessary food supplies, determines operating hours, provides some utilities and equipment for the facility, and is responsible for most equipment maintenance. AR at 31,62 (menus and food supplies); AR at 21,120 (hours); AR 30–31, 142–49 (equipment and utilities). Further, because the facility is an in-house, "mission related" food facility, and not a cash-for-goods facility, the Navy receives whatever income is collected from the minority of persons who pay cash for their meals. AR at 58. Finally, the Navy conducts sanitation and medical inspections. AR at 18–19.

With two possible exceptions—menu selection and the purchase of food supplies—the functions performed by the Navy are secondary, relatively minor or supervisory. For example, the contractor is required by the contract to establish and maintain a Quality Control Program. The Navy does not have immediate responsibility for this function. We would always expect the Navy to retain residual or ultimate quality control for this type of food facility and, indeed, that is all it retains.

Price determination remains under the exclusive control of the Navy. But because the main purpose of the cafeteria is to feed service men and women who are provided their meals without charge, food sales is not a significant element in the functioning of this facility. Unlike a "commercial" eating facility, this is a not-for-profit facility, and there is no "economic risk" based on sales. In any event, sales receipts are collected by the contractor, who must account for them and transfer them to the Navy.

The two noticeable functions retained by the Navy—menu selection and food supply purchasing—may not, on reflection, be as significant as first appears. This is a mission-related food facility for uniform personnel, and as control over nutrition and diet is an important aspect of readiness, it is natural that the Navy retain control. Similarly, this is an appropriated activity, and the Navy would naturally wish to be in direct control of

budget and expenditures. While it is not impossible for the Navy to contract out food purchasing, we think it far more natural for the Navy to retain direct control over expenditures.

We thus regard the Navy's retention of these two functions to be a natural and necessary consequence of the nature of this food facility and its clientele. Consequently, we do not regard the Navy's retention of these functions as significant in determining who "operates" the cafeteria at issue. Nor do we regard the Navy's supervisory role in quality control and management to be of such a dominant nature that the Navy should be considered the "operator."

In summary, the contractor is required to manage the cafeteria, prepare the food, serve the food, provide cleanup and cashier services, implement quality control and training programs, provide certain supplies and equipment and hire the personnel, both managerial and support. Of particular note, the contractor is in charge of day-to-day management of the facility, a function to which we afford great weight. *See also Louisiana Office of Rehab. Servs.*, Civ. No. 98–1392. It is thus apparent that the contractor is responsible for the daily functions of the facility and in that regard must be considered the facility's "operator." Indeed, we conclude that the amalgam of functions allocated to the contractor so outweighs those retained by the Navy, that Mr. O'Sullivan's contrary conclusion is unreasonable.

*The defense of laches:*

We next address the Government's laches defense. The Government argues that the Plaintiff's claim should be barred through the application of the doctrine of laches. MDRS filed its complaint in this Court on September 3, 2003, four days after the CO disqualified its proposal. In the Government's view, MDRS should have challenged the RFP upon its receipt of the CO's letter of May 22, 2003, stating that the solicitation was not subject to the RSA. Alternatively, MDRS should have brought a challenge to the solicitation when it was issued on July 17, 2003, and ostensibly limited to small business concerns, as a section 8(a) set-aside.

The Government's position echoes its earlier argument that this Court should adopt the General Accounting Office's jurisdictional rule, barring protests to the terms of a request for proposals, unless filed prior to the close of bidding. 4 C.F.R. § 21.2(a)(1). We rejected this argument in our Opinion of November 19, 2003, denying the Government's motion for summary judgment. *Miss. Dep't of Rehab. Servs.*, 58 Fed.Cl. at 372–374. In that Opinion we mentioned generally, without approving specifically, the availability of the doctrine of laches in bid protests. *Id.* at 373.

■ Mere passage of time does not constitute laches. The doctrine is premised on the maxim *vigilantibus non dormientibus aequitas subvenit*–equity aids the vigilant not those who slumber on their rights. *Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed. Cir.1988). The defense of laches requires a showing of "(1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or 'defense prejudice'—impairment of the ability to mount a defense..." *JANA, Inc. v. United States*, 936 F.2d 1265, 1269 (Fed.Cir. 1991).

■ Because laches is an equitable defense, in actions of law "[w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." *Advanced Cardiovascular Sys. v. SciMed Life Sys.*, 988 F.2d 1157, 1161 (Fed.Cir.1993). The Tucker Act, which grants this Court's bid protest jurisdiction, does not limit the time in which a bid protest may be brought, allowing suits to be brought both before and after the award of a contract. 28 U.S.C. § 1491(b). Against a backdrop that disfavors the shortening of time limits prescribed by Congress, we examine the contention that MDRS unreasonably delayed bringing this suit.

■ "When applying the doctrine of laches in order to bar a claim, the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter." *Advanced Cardiovas-*

cular Sys., 988 F.2d at 1161. We reject the Government's argument that either the CO's letter of May 22, 2003, or issuance of the solicitation on July 17, 2003, provided MDRS with notice of a claim.

Until Mr. O'Sullivan's letter of August 29, 2003, rejecting MDRS' bid, there remained the possibility that the Navy would apply the RSA to the solicitation. Should MDRS have filed a complaint in this Court prior to the rejection of its bid it would have been vulnerable to a ripeness challenge. Certainly, the mere fact that the solicitation had an 8(a) set-aside did not preclude a RSA bidder. See North Carolina Div. of Servs. for the Blind v. United States, 53 Fed.Cl. 147 (2002); see also DoD memo, citing Department of the Air Force–Reconsideration, 72 Comp. Gen. 241, 1993 WL 212641 (1993), AR at 413; see also GAO Opinion B–290925 (Oct. 23, 2002).

MDRS inquired regarding the NAS Meridian solicitation by letters dated August 7 and 19, 2003. In its August 7 letter, MDRS included a persuasive letter from the DOE concerning the solicitation. This new information may have changed the CO's mind—we have already seen that Mr. O'Sullivan changed his mind on this matter, albeit briefly, with regard to the 1998 RFP. On August 13, 2003, the Navy advised MDRS that Mr. O'Sullivan was on vacation and would respond when he returned on August 18, 2003, the day before the solicitation was due to close. It took Mr. O'Sullivan eleven days after he returned on the 18th to do so. Perhaps if he had not been absent during the bid period he could have acted sooner on MDRS' bid, and the protest could have predated the bid close.

The Government alleges MDRS caused economic prejudice in the form of solicitation costs, both those incurred by other bidders and those incurred by the Navy. The Defendant asserts that these costs would have been avoided had MDRS filed a protest earlier. There are no facts to support this assertion, and in any event we do not find this argument persuasive.

### Conclusion

Having found for MDRS on the merits, we now address the matter of relief. We have found that the Navy violated the RSA in failing to apply it to the NAS Meridian solicitation. However, not all violations of a statute warrant relief—rather, only those that are "clear and prejudicial." Central Arkansas Maintenance, Inc. v. United States, et al., 68 F.3d 1338, 1342 (Fed.Cir.1995). "Clear and prejudicial" violations amount to a breach of the Government's implied contract to consider an offer fairly and honestly and will support a court's exercise of its injunctive powers. Id. Mr. O'Sullivan's refusal to consider MDRS' bid amounts to a clear and prejudicial violation of that statute.

To be entitled to injunctive relief MDRS must make three additional showings: (1) that it will suffer irreparable harm; (2) that the harm to be suffered by it outweighs the harm to the Government and third parties if the procurement is enjoined; and (3) that granting of the relief serves the public interest. See, e.g., Cubic Defense Systems, Inc., v. United States, 45 Fed.Cl. 450, 474 (1999). While it is not by all means clear to this Court that such a showing is required in this pre-award bid protest, MDRS readily meets this standard. Of course, we are not actually enjoining the procurement; we are only directing that it proceed in conformity with the law.

**The Plaintiff's Motion for Judgment on the Administrative Record is hereby GRANTED and the Defendant's Cross–Motion is hereby DENIED. The Navy is ordered to take action consistent with this Opinion, and is enjoined from awarding the solicitation without evaluating MDRS' bid in accordance with the RSA. The Clerk of the Court shall enter judgment for the Plaintiff. Each party shall bear its own costs.**

**IT IS SO ORDERED.**