**Commonwealth of KENTUCKY, Education Cabinet, Department for the Blind, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 04–831C.

United States Court of Federal Claims.

Oct. 13, 2004.

Christopher Solop, Esquire, Jackson, Mississippi, for the plaintiff.

James Poirier, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for the defendant.

## OPINION AND ORDER [1]

BLOCK, Judge.

### I. Introduction

When should the word "may," be construed as "shall?" This is the interpretive conundrum facing this court in this post-award bid protest case. While it is a corner

---

1. This is a redacted version of an opinion originally filed October 6, 2004 under seal pursuant to this court's May 21, 2004 protective order.

The parties were provided an opportunity to propose redactions.

stone of jurisprudence that a court should give effect to the literal meaning of a term in order to effectuate the intention of the legislature, it was also established long ago that it is only through custom, usage, convention, and especially in its context, that statutory language establishes a coherent meaning. *See Pennington v. Coxe,* 6 U.S. (2 Cranch) 33, 52–53, 2 L.Ed. 199 (1804) (Marshall, C.J.) ("That a law is the best expositor of itself, that every part of an act is to be taken into view, for discovering the mind of the legislature; and the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act. . . . ").

■ Indeed, when enforcement of the literal interpretation of a statute would lead to an absurd result, *United States v. Bryan,* 339 U.S. 323, 338, 70 S.Ct. 724, 94 L.Ed. 884 (1950), or thwart the purpose of the statute, *In Re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), *Trustees of Indiana University v. United States,* 223 Ct.Cl. 88, 94, 618 F.2d 736, 739 (1980), literal interpretation must be jettisoned in favor of a rational inquiry based on the context and purpose of the statute. Without taking heed of the latter wisdom, sometimes the danger arises that "wooden literalism" could make a statute, and especially its component remedial parts, unworkable. Such is the case here.

More specifically, this case chiefly involves the effect of the Randolph–Sheppard Act ("RSA" or "the Act") on the contract award process and on the jurisdiction of this court over bid protests. The parties dispute whether the United States Army ("Army") improperly failed to award a cafeteria vending contract to the plaintiff, the Kentucky Department for the Blind ("KDB"), a state licensing agency ("SLA") that represents the interests of blind vendors. Under the RSA, SLAs receive a priority in the procurement process to operate vending facilities on government property if their bids satisfy certain conditions established by regulation promulgated by the Department of Education ("DOE").

One condition to a SLA receiving a priority is that the SLA's bid must fall within a "competitive range" for the solicitation. This essentially means that the SLA's bid must successfully fall within a range established by the contacting officer in order to receive the priority for the contract award. Here, the Army's contracting officer found that KDB's bid fell outside the competitive range because its estimated price was too high. KDB filed a post-award bid protest in this court challenging its exclusion from the competitive range, claiming that the Army improperly evaluated its bid.

KDB's complaint, however, raises a significant jurisdictional issue. The Randolph–Sheppard Act, in addition to providing employment opportunities to blind vendors, also establishes an arbitration process within the DOE for resolution of disputes that arise under the Act. KDB admits that it has not sought resolution of the present dispute through arbitration. *See* July 20, 2004 Hearing Tr. at 21–22. The government's principal argument is that recourse to arbitration is mandatory, and KDB's failure to exhaust its administrative remedies deprives this court of jurisdiction to consider KDB's post-award bid protest. KDB argues, to the contrary, that the language of the RSA's arbitration provision is permissive and primarily relies for support on this court's opinions in *Texas State Commission for the Blind v. United States,* 6 Cl.Ct. 730, 735–36 & n. 12 (1984), *rev'd on other grounds,* 796 F.2d 400 (Fed. Cir.1986) (en banc) and *Washington State Department of Services for the Blind v. United States,* 58 Fed.Cl. 781, 786 n. 8 (2003).

This court, however, rejects the reasoning of these opinions to the extent that these decisions are contrary to the rationale of *Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90 (D.C.Cir.1986). In that case, the D.C. Circuit applied a long-accepted rule of statutory construction in holding that Congress intended the arbitration requirement to be mandatory, regardless of any permissive language in the statute. *See, e.g., United States v. Babcock,* 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011 (1919) (Brandeis, J.) (applying the "well settled" rule that "where a statute creates a right and provides a special remedy, that remedy is exclusive").

Before the court are the parties' cross-motions for summary judgment pursuant to Rule 56.1 of the Rules of the Court of Federal Claims ("RCFC"), and the government's RCFC 12(b)(1) motion to dismiss for lack of jurisdiction. For the reasons stated herein, the court concludes that the Randolph–Sheppard Act requires exhaustion of administrative remedies and, therefore, the court grants the government's RCFC 12(b)(1) motion.

## II. The Randolph–Sheppard Act and the Blind Vendors Program

The Randolph–Sheppard Act [2] established a program to promote the interests of the blind by authorizing blind persons to operate vending facilities in federal buildings with the goal of expanding economic opportunities available to the blind community. 20 U.S.C. § 107(a) (2000). The intentions behind the program are noble, and Congress has championed its benefits: "The dignity and pride engendered by the development of skills and entrepreneurial ability represent the finest example of a healthy, vigorous, compassionate society combined with the true expression of an American ideal—self-respect, independence, and meaningful contribution to that society." S. REP. No. 93–937 at 14 (1974). Congress has also expressed concern for what the quality of life might be like for blind vendors without the program, fearing they might otherwise lead "a marginal existence on welfare, a life without hope or joy, a burdensome, stultifying dependence." Id.

The Act accomplishes its goals by establishing a program under which federal buildings must contain a satisfactory site for a blind person to set up and operate a vending facility. 20 U.S.C. § 107a(d)(1). The vending facilities may sell such wares as "newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles or services dispensed automatically or manually." 20 U.S.C. § 107a(a)(5). Blind vendors, in turn, receive a priority in operating those facilities, provided they satisfy criteria established by regulation. 20 U.S.C. § 107(b).

The Department of Education is charged with overseeing the Act and prescribing regulations, and the SLAs are responsible for implementing the programs on the local level. 20 U.S.C. §§ 107, 107a. The SLAs license individual blind vendors within their respective states, and manage the procurement process on behalf of the vendors. 20 U.S.C. § 107a. The SLA is also charged with monitoring a contracting agency's compliance with the RSA and challenging any non-compliance. Id.

In its original form, the Act granted a preference to blind vendors to establish vending stands. Years later, however, concern grew that blind vendors were being "muscled out" of their livelihood by coin-operated vending machines installed by the employees of various government buildings housing the vendors.[3] S. REP. No. 93–937 at 5–6. In response, Congress amended the Act in 1954 to provide blind vendors already operating stands with a preference in the operation of any coin-operated vending machines in their respective federal building. Id. at 14. In 1974 Congress was still disenchanted that the program was not reaching its full potential, and again amended the Act, granting blind vendors a priority, rather than a preference, in operating vending facilities. Id. at 14. In changing the blind vendor program's procurement "preference" to a "priority," Congress hoped to strengthen the program by assuring "that one or more blind vendors have a *prior right* to do business on such property, and furthermore that, to the extent that a ... non-blind operated vending machine competes with or otherwise economically injures a blind vendor, every effort must be made to eliminate such competition or injury." Id. at 15. Prior to the 1974 Amendment, it was believed that contracting agencies had failed to accord the blind vendors' "preference" the dignity in the procurement process that Congress envisioned. Id. at 14–15.

It is also important to note that the 1974 Amendment also established an arbitration

---

2. 20 U.S.C. §§ 107–107f.

3. The vending machines were apparently a popular method of raising funds for unions or employ-

ee social activities. *See* S.Rep. No. 93–937 at 5–6; *see also Tex. State Comm'n for the Blind v. United States,* 796 F.2d 400, 402 (Fed.Cir.1986).

scheme for the resolution of disputes arising under the Act. *See* S. REP. No. 93–937 at 20. Both the priority and arbitration schemes take center stage in this case and, thus, are discussed at length below.

### III.   Background [4]

As noted above, the parties dispute whether the Army followed proper procurement procedures when it awarded a contract for services. Although the court's conclusion ultimately rests on jurisdictional concerns only marginally related to the specific facts, some understanding of KDB's substantive claim and the facts on which it relies is helpful.

*A.   The Solicitation*

On October 14, 2003, the Army issued a Request for Proposals, identified as solicitation No. DABK09–03–R–0010 ("solicitation"), for a firm fixed-price requirement contract for dining facility attendant services ("DFA services") at Fort Campbell, Kentucky. Admin. R. at 129, ¶ 18. The solicitation covered one base year and one option year and the Independent Government Estimate ("IGE") for both years combined was $7,817,074. *Id.* at 131, ¶ A & 370.

Of primary relevance to the court's jurisdictional analysis, Section L of the solicitation clearly stated that the Army would accept offers from SLAs. *Id.* at 369, ¶ 8. Similarly, Section M noted that:

> This solicitation and proposed contract is subject to and [sic] guidelines of the Randolph–Sheppard Act. Therefore, State Licensing Agencies will be afforded priority. If a State Licensing Agency's proposal is determined to be within the competitive range and ranked among those proposals which have a chance of being selected for the final award, a contract will be awarded to the State Licensing Agency based upon the priority afforded them under the Randolph–Sheppard Act and implementing instructions.

*Id.* at 380, ¶ 3 (emphasis added). A document summarizing the evaluations of all bids received under the solicitation indicated that offers received from SLAs would be subject to the statutory provisions of the RSA, the DOE's implementing regulations (34 C.F.R. § 395) and the Army's implementing regulations (Army Reg. 210–25). *Id.* at 369.

KDB's procurement challenge focuses on the solicitation's bid evaluation criteria, and the type of information required to support each bid. The solicitation provided that "[w]ith respect to offers from State Licensing Agencies, the government will evaluate all factors based upon the qualifications and submission of the blind vendor/licensee and its subcontractor which shall be included in the State Licensing Agency's offer." *Id.* at 378, ¶ 8. The solicitation required each offeror to submit a detailed price proposal and a record of past performance that described prior contracts performed by all parties and subcontractors to a bid and identified Points of Contact ("POC") for each referenced prior contract. *Id.* at 378–79. Each offeror was also responsible for distributing performance questionnaires to contacts for contracts (both past and present) that were not listed in the Past Performance Information Retrieval System (PPIRS) to facilitate an assessment of each offeror's past performance. *Id.* ¶¶ 2.5, 2.6.

The solicitation section entitled "EVALUATION" outlined the methods and criteria that the Contracting Officer ("CO") would apply to evaluate bids. *Id.* at 380. It indicated that the Army intended to make an award without discussions, so bids should represent an offeror's best price. *Id.* ¶ 2. It also defined the price and performance ratings the CO would assign after evaluating each offeror's bid. The CO would rate each offeror "Satisfactory" or "Unsatisfactory" with regard to price, and past performance would receive one of six scoring marks, the two highest of which were "Exceptional/Very Low Risk" and "Very Good/Low Risk." *Id.* ¶ 2.

The solicitation required the CO to evaluate proposals based on price and past performance to find one that "offer[ed] value in meeting the requirements and quality performance with acceptable risk at a fair and reasonable price." *Id.* at 381, ¶ 1. "Price would be evaluated using a combination of

---

4. The court has derived the facts of this case    from the administrative record.

cost and price analysis techniques" yielding a "Cost/Price" factor—a seemingly amorphous concept that may best be characterized as the value the Army would receive for the price it would be charged. *Id.* ¶ 2. Past performance evaluations would be based on an offeror's overall experience and relevant evaluations of performance. *Id.* ¶ 3. Although the CO would award the contract to the offeror whose proposal was the "most advantageous to the government, price *and* past performance considered," the solicitation explicitly provided that the Cost/Price factor (*i.e.*, the value factor) was significantly more important. *Id.* (emphasis added).

### B. KDB's Bid

KDB, as the Commonwealth of Kentucky's SLA, was one of nine bidders to submit a proposal in response to the solicitation. *Id.* at 97. Along with its bid, KDB submitted a list of cafeteria services contracts that KDB and/or its subcontractors had performed within the relevant three-year period prescribed by the solicitation, and provided references for its past performance of these services at Fort Campbell from 1991 through 1996. *Id.* at 1259–67. KDB estimated its total cost for the Fort Campbell DFA service to be less than the IGE. *Id.* at 122, 370.

On April 15, 2004, the Army notified KDB that it had awarded the contract to another offeror. *Id.* at 128. The rationale behind this award was documented in the "CONTRACTING OFFICER'S DETERMINATION." *Id.* at 458. Since the solicitation noted that this procurement would not be negotiated, the Federal Acquisition Regulations did not require the CO to form a competitive range. *Id.* at 380, ¶ 2; 48 C.F.R. § 15.306(c). The CO expected to receive bids from one or more SLAs, however, and therefore formed a competitive range to comply with the RSA; this competitive range consisted of three offerors whose proposed prices were within 7% of each other, but did not include KDB. Admin. Rec. at 458; Def.'s Mot. to Dismiss at 11–13. The winning bid

was nearly 17% below the IGE. Admin. Rec. at 458. Based on the close proximity of the three offerors included in the competitive range, the CO determined both that a reasonable separation existed between those offerors in the competitive range and KDB (and the other offerors excluded from the competitive range), and that the Army had overstated its Initial Government Estimate for the project. *Id.*

Pursuant to 48 C.F.R § 15.506,[5] on April 16, 2004 KDB requested a debriefing from the Army explaining the award, which the Army conducted shortly thereafter at Fort Campbell, Kentucky. *Id.* at 126. The debriefing revealed that KDB's price proposal was considerably higher than the winning bid. *Id.* at 112–13. Furthermore, the past performance evaluation was hampered because none of KDB's Points of Contact for prior contracts returned past performance questionnaires, and the Army expressed doubt whether KDB distributed them per the solicitation's terms. *Id.* at 116. The CO retrieved three Contractor Performance Assessment Reports by searching the PPIRS. One report gave KDB a review of "Exceptional" and "Very Good;" the other two were also positive, but qualified with negative comments about KDB. *Id.* at 117–118. In light of these reports, the CO evaluated KDB's overall past performance as "Very Good/Low Risk." *Id.* at 119. Although KDB received the same performance rating as the three bids in the competitive range, all told six out of the nine submitting offerors received the very same "Very Good/Low Risk" rating. *Id.* at 122. Ultimately, the CO excluded KDB's bid from the competitive range solely because the price proposal was far too high compared to the three bids that comprised the range. *Id.* at 120, 123. The Army concluded its debriefing by asserting that the award to the winning offeror was the most advantageous to the government. *Id.* at 123.

On April 23rd, 2004, KDB filed a protest of the award to the General Accounting Office

---

5. 48 C.F.R. § 15.506 sets forth the provisions for post award debriefing of offerors. KDB referred to 48 C.F.R. § 15.506(a)(1), which provides, "An offeror, upon its written request received by the agency within 3 days after the date on which that offeror has received notification of contract award in accordance with 15.503(b), shall be debriefed and furnished the basis for the selection decision and contract award." 48 C.F.R. § 15.506(a)(1).

("GAO"). *Id.* at 66–108. The crux of its argument, both then and now, is that the Army should have included KDB in the competitive range, despite the considerable increase in price over the actual contract award that KDB's bid represented. The GAO dismissed the protest on May 4, 2004, for lack of jurisdiction. Pl.'s First Am. Compl. at 96. In its decision letter, which ultimately mirrors the conclusion of this court, the GAO's general counsel provided the following rationale for dismissing KDB's protest:

> We dismiss this protest because our Office generally has no jurisdiction to review the exclusion from the competitive range of a SLA under the Randolph–Sheppard Act, 20 U.S.C. §§ 107–107f (2000) .... The relevant provision of the Randolph–Sheppard Act, 20 U.S.C. § 107d–1 vests the Secretary of Education with exclusive authority to resolve a complaint by a SLA concerning a federal agency's compliance with the Act, including a challenge to an agency decision to reject a proposal in response to a solicitation .... Our Office will not review issues that go to the question of whether the SLA should have been included in the competitive range, because such issues ultimately challenge whether the agency's actions improperly denied the SLA the priority required under the statutes and regulations, and therefore must be resolved through the arbitration process.

*Id.*

On May 14th, 2004, KDB filed a post-award bid protest in this court, requesting in part the following relief:

> 1. An order enjoining the Army from proceeding with the performance of the contract awarded under Solicitation No. DABK09–03–R–0010 pending resolution of the KDB's protest on the merits either by this Court or through arbitration;
> 2. A finding that the Agency's failure to comply with the evaluation procedures and criteria set forth in the Solicitation was arbitrary and unreasonable and had the prejudicial effect of eliminating the KDB from the competitive range thereby denying it award of the contract under the

Solicitation, in violation of the solicitation requirements and the RSA; [and]

> 3. An order directing the Agency to terminate its contract award to [the original winning offeror] for convenience and award the contract under the Solicitation to the KDB.

*Id.* at 14–15. The parties subsequently participated in a June 10, 2004 teleconference during which they agreed there was no need for a temporary restraining order. This court then conducted an oral argument on July 20, 2004.

## IV. Discussion

### A. *Jurisdiction and Standard of Review.*

Because all federal courts are courts of limited jurisdiction, it is necessary for the plaintiff to establish a jurisdictional predicate to maintain this action. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). This need to establish jurisdiction at its root stems from a cornerstone of our jurisprudence, the doctrine of sovereign immunity. *See United States v. Lee,* 106 U.S. (16 Otto) 196, 206, 1 S.Ct. 240, 27 L.Ed. 171 (1882). The United States "is immune from suit except as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The government must unequivocally express its consent in a clear statement waving sovereign immunity. *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). For the U.S. Court of Federal Claims, the Tucker Act operates as a waiver of sovereign immunity for non-tort suits against the United States premised on the Constitution, a statute or regulation, or either an express or implied contract with the United States. *See* 28 U.S.C. § 1491(a)(1); *United States v. Testan,* 424 U.S. 392, 397, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

The Tucker Act in general, however, does not create a substantive right enforceable against the United States for money damages; it merely confers jurisdiction on this

court whenever that substantive right exists. *Testan,* 424 U.S. at 398, 96 S.Ct. 948 (citing *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007–09 (1967)). Consequently, a plaintiff must premise its claim on a separate statute or regulation permitting recovery. *Id.; Rinner v. United States,* 50 Fed.Cl. 333, 335 (2001).

That separate statute here is an amendment to the Tucker Act itself. The Tucker Act was amended in 1996 to include new section 1491(b),[6] explicitly granting the Court of Federal Claims authority to entertain bid protests challenging "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *See Res. Recycling Corp. v. United States,* 56 Fed.Cl. 612, 617–18 (2003). Prior to that amendment, bid protest actions historically were limited to pre-award protests and were predicated on the notion that the government has an implied-in-fact contract of fair dealing with bidders. *See, e.g., Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1078–80 (Fed.Cir.2001); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1331–32 (Fed.Cir.2001). The Tucker Act was construed by courts merely to buttress the judicially-created claim to protest the pre-award government bid process. *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir.1998) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983); *Cent. Ark. Maint., Inc. v. United States,* 68 F.3d 1338, 1341 (Fed.Cir.1995)).

The Act requires the court to evaluate the procuring agency's conduct to determine whether it was arbitrary and capricious under the standards set forth in the Administrative Procedure Act (APA). *See* 28 U.S.C.

§ 1491(b)(4) (2003) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").

Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte. Folden v. United States,* 379 F.3d 1344, 1354 (Fed.Cir.2004). This court, moreover, "obviously has jurisdiction to determine whether it has jurisdiction over a particular matter." *Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999) (*quoting Widdoss v. Sec'y of the Dept. of Health and Human Servs.,* 989 F.2d 1170, 1177 (Fed.Cir.1993)) (internal quotation marks omitted). And when this court hears such a jurisdictional challenge, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* But, because KDB's jurisdictional predicate is the heart of the issue in this case, KDB, as the party asserting this court's jurisdiction, necessarily bears the burden of establishing this court's jurisdiction by a preponderance of the evidence. *Taylor v. United States,* 303 F.3d 1357, 1359 (Fed.Cir.2002). "Since they are not mere pleading requirements but rather an indispensable part of plaintiff's case, [jurisdiction] must be supported in the same manner as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of litigation." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

What makes this bid protest unusual is the jurisdictional issue arising from the solicitation's citation to the Randolph–Sheppard Act.[7] Despite KDB's bid protest challenging

---

6. 28 U.S.C. § 1491(b)(1) (2003) provides:
Both the Unites States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the

United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.
28 U.S.C. § 1491(b)(1) (2003).

7. As noted above, Section M of the Solicitation indicated "NOTE: This solicitation and proposed contract is subject to and guidelines [sic] of the Randolph–Sheppard Act." Admin. R. at 380, ¶ 3.

the Army's contract award to another offeror, the key question in this case is whether State Licensing Agencies like KDB must seek relief under the RSA's arbitration scheme before filing a post-award bid protest. The government argues that exhaustion is required and that this implicates the very jurisdiction of this court. Indeed, if the RSA does require exhaustion of arbitration prior to seeking judicial relief, this court must dismiss KDB's complaint for lack of jurisdiction. *See McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (noting that courts commonly apply the exhaustion doctrine in cases where a litigant seeks judicial relief before the administrative process is complete to avoid premature interruption of the administrative process); *Consol. Bearings Co. v. United States,* 348 F.3d 997, 1003 (Fed.Cir.2003); *Sandvik Steel Co. v. United States,* 164 F.3d 596, 599 (Fed.Cir.1998) ("When administrative remedies have not been exhausted, 'judicial review of administrative action is inappropriate,' since it is 'a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.' ") (quoting *Sharp Corp. v. United States,* 837 F.2d 1058, 1062 (Fed.Cir.1988); *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54(1952)).

**B.** *The RSA's Statutory Framework and Its Implementing Regulations*

To resolve this exhaustion issue, the court must commence its analysis with the plain meaning of the Randolph–Sheppard Act. *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 364 F.3d 1339, 1345 (Fed.Cir.2004); *White v. Dep't of Justice,* 328 F.3d 1361, 1374 (Fed.Cir.2003). Chief Justice John Marshall observed that in construing statutes, "it has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words the legislature has employed to convey it." *Schooner Paulina's Cargo v. United States,* 11 U.S. (7 Cranch) 52, 60, 3 L.Ed. 266 (1812). Thus, the first step is to determine whether the applicable statutory provision possesses a plain and unambiguous meaning with regard to the particular issue in this case. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

To determine whether the statutory language is clear and unambiguous, this court must look at "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson,* 519 U.S. at 341, 117 S.Ct. 843. Accordingly, a statute—and especially its component parts—should be read in context. *See Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, ——, 124 S.Ct. 1236, 1246, 157 L.Ed.2d 1094 (2004) ("[s]tatutory language must be read in context [since] a phrase gathers meaning from the words around it") (quoting *Jones v. United States,* 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (quotation omitted)) (alterations in original). "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived. . . ." *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 385–89, 2 L.Ed. 304 (1805) (Marshall, C.J.) (analyzing statutory language in the context of the title of the statute); *see also Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) ("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act . . . .").

Similarly, at times the purpose or design of a statute is paramount in understanding the context of its words and provisions. The purpose of a statute and its underlying policy construed from the statutory text may be highly relevant to both the interpretation of words and the application of the statute to the facts at hand. *See, e.g., Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."). It is, at times, thus helpful to look to legislative history, not as a Rosetta Stone to divine the meaning of words and phrases, but as a mechanism to ascertain the act's purpose and aid in establishing the context of its provisions. *See, e.g., Gen. Dynamics Land Sys., Inc.,* 540 U.S. 581, 124

S.Ct. 1236 (construing Age Discrimination in Employment Act (ADEA) in light of congressional purpose in preventing "old age" discrimination in employment); *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569, 1572 (Fed.Cir.1997) (construing Energy Policy Act of 1992 in light of purpose of statute and end to be achieved).

■ The court should look beyond the plain meaning of the statute *only* if the language is ambiguous or a literal interpretation would frustrate the purpose behind the statute. *White v. Dep't of Justice*, 328 F.3d 1361, 1374 (Fed.Cir.2003) (Mayer, C.J., dissenting) (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983)). Thus, when enforcement of the literal interpretation of a statute would lead to an absurd result, *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct. 724, 94 L.Ed. 884 (1950), or thwart the purpose of the statute, *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), *Trustees of Indiana University v. United States*, 223 Ct.Cl. 88, 94, 618 F.2d 736, 739 (1980), the plain meaning doctrine must be replaced by a rational inquiry based on the context and purpose of the statute.

■ And "[w]here the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings needs no discussion." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *see Int'l Business Machines Corp. v. United States*, 201 F.3d 1367, 1372 (Fed.Cir.2000). Thus, only where there is an ambiguity, where words are reasonably susceptible to two or at least a finite few meanings, may courts resort to other aids or rules of statutory construction. *See, e.g., Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n. 2. (Fed.Cir.2000). These "rules" are "extrinsic" and "intrinsic" aids, such as legislative history and the canons of statutory construction developed at common law. *See generally* N. SINGER, 2A SUTHERLAND'S STATUTORY CONSTRUCTION Chpt. 47–48 (West 6th ed.2000).

With these rules of interpretation in mind, the court turns to the text and purpose of the Randolph–Sheppard Act and its implementing regulations, with particular focus on the arbitration provisions and the priority scheme that they establish.

1. *The Randolph–Sheppard Act and the Department of Education Regulations*

a. The Blind Vendor Priority.

The Randolph–Sheppard Act was enacted in 1936 "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a). As noted above and described more fully below, the RSA accomplishes these goals by giving a priority to state-licensed blind vendors to operate vending facilities on federal property. 20 U.S.C. § 107(b). That priority is determined generally by the terms of the RSA, but more specifically pursuant to regulations prescribed by the Secretary of the DOE. *Id.* Most of the priority scheme is established by the Secretary's rule-making authority rather than statute.

It is significant that the RSA confers upon the Secretary of Education the primary rule-making authority to carry out the purposes of the RSA.

> The Secretary [of Education], through the Commissioner [of the Rehabilitation Services Administration], shall prescribe regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise.

20 U.S.C. § 107d–3(e). While the DOE and the Army have both promulgated regulations pursuant to the RSA, and while the solicitation indicated that it was subject to both the DOE and Army regulations implementing the Act, it is apparent from the text of the Act that only the DOE has been charged with primary rule-making authority. To the

extent that Congress has delegated implementation of the RSA to DOE, then, deference shall be given to that agency's implementing regulations. *See generally I.N.S. v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). By contrast, Congress has not delegated rule-making authority or the duty to implement the RSA to the Army. Consequently, where there exists conflicts between particular DOE and Army regulations promulgated pursuant to the RSA, the court must give deference to the DOE regulation. *See Miss. Dep't of Rehab. Servs. v. United States,* 61 Fed.Cl. 20, 25 (2004) (deferring to the DOE's interpretation of the RSA because that agency is charged with administering the statute, while reviewing the Navy's interpretation of the statute *de novo* ); *accord NISH v. Cohen,* 247 F.3d 197, 203 (4th Cir.2001) ("[The Department of Defense]'s role in implementation of the RS Act is primarily to follow the decisions of DOE. It is DOE's administration of the RS Act that is authorized by statute, and thus entitled to deference.") (citing *Shanty Town Assocs. Ltd. P'ship v. EPA,* 843 F.2d 782, 790 (4th Cir.1988) (concluding that there is no deference accorded to the interpretation of a statute by an agency that does not administer it)).

It is the DOE regulations that establish the primary procedure for awarding blind vendors the priority under the RSA. *See* 20 U.S.C. § 107(b). Generally, blind vendors will receive the priority when:

> the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided by employees, whether by contract or otherwise.

34 C.F.R. § 395.33(a). In awarding the priority, therefore, the Secretary must evaluate the quality and costs of the blind vendor's services to ensure that they are comparable to those of an incumbent vendor or other offerors. In order to provide the Secretary with the information necessary to make this determination, the regulations require the contracting agency to invite a blind vendor's SLA to "respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality." 34 C.F.R. § 395.33(b). If the contracting agency issues a solicitation for a contract, the agency must ensure its solicitation:

> establish[es] criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices.

*Id.*

If an SLA submits a bid pursuant to the solicitation, the regulations describe a two-step procedure that the contracting agency then must follow:

> If the proposal received from the [SLA] is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the ... agency shall consult with the Secretary as required under [34 C.F.R. § 395.33(a)].

*Id.* The SLA, hence, must clear two hurdles before receiving a priority under the RSA. First, the managing agency must find that the SLA falls within "a competitive range" and possesses "a reasonable chance" of receiving the contract. *Id.* Second, after the managing agency makes the aforementioned determinations, the agency must consult with the Secretary of Education to determine whether the SLA's operations "can be provided at a reasonable cost, with food of a high quality." 34 C.F.R. § 395.33(a). In other words, the regulations do not provide an automatic priority for an SLA whose proposal falls within a competitive range; even if the SLA's proposal does fall within the competitive range, the Secretary could still deny the SLA the priority. *See In re Cantu Servs., Inc.,* B–289666.3, 2002 CPD ¶ 189, 2002 WL 31572230 (Nov. 1, 2002) ("once the SLA's proposal has reasonably been included in the competitive range, the RSA and its implementing regulations vest the decision to award or not with the agency and the Secretary of Education").

### b. The RSA Arbitration Scheme

The blind vendor arbitration mechanism is established by statute. The 1974 amendment to the RSA created a two-tiered remedy scheme for blind vendors that become dissatisfied with "any action arising from the operation or administration of the vending facility program," 20 U.S.C. § 107d–1(a), and SLAs that determine a federal agency is "failing to comply" with the RSA provisions. 20 U.S.C. § 107d–1(b). The statutory language does not explicitly state whether this arbitration scheme is mandatory or optional, *i.e.*, whether administrative exhaustion is required or not. Therefore, as will be discussed at length below, such an inference must be drawn from the specific language and the statutory scheme and purpose. *See Crandon*, 494 U.S. at 158, 110 S.Ct. 997; *Ohio v. Robinette*, 519 U.S. 33, 34, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

First, the individual blind vendor "may submit to a[SLA] a request for a full evidentiary hearing." 20 U.S.C. § 107d–1(a). If the vendor disagrees with any of the SLA's findings at the hearing, he then "may file a complaint with the Secretary." *Id.* In the second tier of the RSA's remedy scheme, which focuses on the state licensing agency's ability to challenge a contracting agency's action, an SLA "may file a complaint with the Secretary" whenever:

> any [SLA] determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder . . . .

20 U.S.C. § 107d–1(b).

If a vendor or SLA files a complaint with the Secretary, "the Secretary shall convene an ad hoc arbitration panel" pursuant to § 107d–2 "and the decision of such panel shall be final and binding on the parties except to the extent as otherwise provided in this chapter." 20 U.S.C. § 107d–1(a), (b). The panel's arbitration decisions are "subject to appeal and review as a *final agency action.*" 20 U.S.C. § 107d–2 (emphasis added).

The DOE regulations that implement the statute's arbitration provisions mirror the statute. *See* 34 C.F.R §§ 395.33 & .37.

### C. *Exhaustion and the Jurisdictional Analysis*

■ The RSA does not contain specific statutory language that explicitly requires exhaustion of the administrative arbitration procedures prior to judicial intervention. The lack of clear directional language does not, however, foreclose the potential applicability of this doctrine,[8] because the context of the Act as a whole may signal that exhaustion was intended. The meaning of a statute is revealed not only through the specific language used by Congress, but also through the context in which the language is used and the context of the entire statute. *Robinette*, 519 U.S. at 34, 117 S.Ct. 417; *see also Richards*, 369 U.S. at 11, 82 S.Ct. 585; *Fisher*, 6 U.S. (2 Cranch) at 385–89.

A good example which happens to be of particular relevance to the present case is *Randolph–Sheppard Vendors of America v. Weinberger*, 795 F.2d 90 (D.C.Cir.1986). In *Weinberger*, the Court of Appeals for the D.C. Circuit focused on the "clear and explicit system for resolution of disputes arising under the Act" to construe the meaning of the RSA as a whole and Congress's intent to construct a mandatory arbitration process.

---

8. Although there are certainly instances in which Congress has explicitly required exhaustion of administrative remedies, *see, e.g.,* 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."), the omission of such explicit language does not signal that Congress desired that exhaustion not apply. *See McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("Of paramount importance to any exhaustion inquiry is congressional intent. Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs. Nevertheless, even in this field of judicial discretion, appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme.") (citations omitted).

*Id.* at 102. *Weinberger* noted that the arbitration provisions in the Act parallel the different tiers of authority created to administer its provisions. Namely—

> [u]nder the substantive provisions of the Act, a blind person must apply for a license from a state agency. The state agency then applies to a federal agency for placement of the licensee. Similarly, under the dispute resolution scheme, a blind licensee must first apply to the state licensing agency before filing a complaint with the Secretary. As under the substantive provisions of the Act, a state licensing agency has direct resort to the Secretary under the dispute resolution system.

*Id.* at 102–03. This elaborate scheme is comprehensive in its organization of levels of authority and the scope of review. Significantly, the statute dictates that the DOE arbitration decision "shall be subject to appeal and review as a final agency action." § 107d–2(a). As *Weinberger* points out, "[i]n contrast to *de novo* review, judicial review of final agency action is 'severely circumscribed,' requiring a reviewing court to determine whether a decision is within the ambit of the agency's discretion and supported by the record." *Weinberger*, 795 F.2d at 103 (quoting *Process Gas Consumers Group v. U.S. Dep't of Agric.*, 694 F.2d 728, 740 (D.C.Cir.1981)); *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91

S.Ct. 814, 28 L.Ed.2d 136 ("[T]he ultimate standard of review is a narrow one.").

■ *Weinberger*'s ultimate conclusion was that "[i]t is unlikely, after establishing a specific dispute resolution system and conditioning judicial review on a final agency action, that Congress contemplated that an aggrieved party could, whenever it chose, circumvent the system and seek *de novo* determination in federal court." *Weinberger*, 795 F.2d at 103. Indeed, it would seem inconsistent with the purpose behind the 1974 amendments to provide alternative venues for resolution of RSA disputes; Congress specifically designed the arbitration scheme to supercede or replace judicial intervention into RSA grievances.[9] The general rule is that "where a statute creates a right and provides a special remedy, that remedy is exclusive." *United States v. Babcock*, 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011 (1919). "Thus, where Congress has created an arbitration scheme as the administrative method for enforcing a statutory right, there is a strong presumption that it is exclusive." *Weinberger*, 795 F.2d at 90.[10]

■ The court noted that its conclusion that exhaustion is mandatory is belied by the plain meaning of the sections of the Act, which set out the dispute resolution process for both blind vendors and state licensing agencies. *Weinberger*, 795 F.2d at 102 n. 19.

---

9. This conclusion is supported by language contained in the Senate Report accompanying the 1974 amendment:

> The Committee considers the arbitration procedures contained in S. 2581 to be valuable tools for the resolution of disputes.... Moreover, [prior to the amendment] blind vendors have attempted to bring their grievances to the judicial system for resolution.... It is the expectation of the Committee that the arbitration and review procedures adopted in S. 2581 will provide the means by which aggrieved vendors and State agencies may obtain a final and satisfactory resolution of disputes.

S. REP. No. 93–937, at 20 (1974). The report indicates that it was the expectation of Congress that arbitration would be *the* mechanism for dispute resolution, rather than merely one of several. Furthermore, it appears that the arbitration mechanism was a response to the fact that these disputes were increasingly being brought before the judiciary for resolution; arbitration was devised as a scheme to *replace* judicial intervention in RSA disputes, rather than *accompany* it.

10. Compare this result with the reasoning employed by the Supreme Court in *McCarthy v. Madigan*, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). In *McCarthy*, the Court considered whether a Bureau of Prisons' grievance procedure required exhaustion prior to judicial review. Looking first to congressional intent, the Court was primarily influenced by the fact that "the general grievance procedure was neither enacted nor mandated by Congress," but rather created by the Bureau of Prisons under authority delegated by Congress. *McCarthy*, 503 U.S. at 149, 112 S.Ct. 1081. "By delegating authority, in the most general of terms, to the Bureau to administer the federal prison system, Congress cannot be said to have spoken to the particular issue whether prisoners in the custody of the Bureau should have direct access to the federal courts." *Id.* By contrast, in the RSA Congress specifically provided for an administrative arbitration system to resolve grievances in the blind vendor program. *See* 20 U.S.C. § 107d–1.

In these sections, the word "may" is used as opposed to the word "shall." *See* 20 U.S.C. § 107d–1(a), (b) ("Any blind licensee ... *may* submit ... a request for a full evidentiary hearing ...;" "any ... licensing agency *may* file a complaint with the Secretary ...."*) (emphasis added). Applying a long-held principle of statutory construction, the *Weinberger* court asserted that while " 'shall' is normally the language of command in a statute" and " 'may' is ordinarily construed as permissive," *id.* (quoting *Haig v. Agee,* 453 U.S. 280, 294 n. 26, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *Thompson v. Clifford,* 408 F.2d 154, 158 (D.C.Cir.1968)), the construction of the word "may" as discretionary "is by no means invariable, ... and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." *Id.* (quoting *United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983); *Thompson,* 408 F.2d at 158 ("conclusion of discretion depends 'on the context of the statute.' ") (quoting *United States ex rel. Siegel v. Thoman,* 156 U.S. 353, 359, 15 S.Ct. 378, 39 L.Ed. 450, (1895))). "Here we find that the purpose and context of the statute," the court concluded, "defeats any inference of general discretion to be garnered from Congress' use of the word 'may' ...." *Id.* Thus, *Weinberger,* in determining the meaning of the statute, looked "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon,* 494 U.S. at 158, 110 S.Ct. 997; *see also Bob Jones Univ.,* 461 U.S. at 586, 103 S.Ct. 2017.

*Weinberger's* statutory interpretation is sound. This court concludes not only that *Weinberger* is persuasive, but also that it represents the best rationale for evaluating the scope of the RSA's arbitration scheme and its implicit requirement of administrative exhaustion before judicial intervention will obtain. Other courts have also conclusively adopted exhaustion as the rule in RSA disputes. *See, e.g., Committee of Blind Vendors v. District of Columbia,* 28 F.3d 130, 135 (D.C.Cir.1994) ("[T]he text of the Act manifests Congress's intent that aggrieved vendors pursue their administrative remedies before resorting to Article III adjudication.")

(citing *Weinberger,* 795 F.2d at 101–04); *Fillinger v. Cleveland Soc. for the Blind,* 587 F.2d 336, 338 (6th Cir.1978) ("Congress' decision to provide administrative and arbitration remedies for aggrieved blind vendors clearly evidences a policy judgment that the federal courts should not be the tribunal of first resort for the resolution of such grievances. Rather congressional policy as reflected in the 1974 amendments is that blind vendors must exhaust their administrative and arbitration remedies before seeking review in the district courts."); *Middendorf v. United States,* 92 F.3d 1193 (9th Cir.1996) (table opinion) ("Judicial review of a vendor's claim may only occur after the decision of an arbitration panel convened by the Secretary."); *Morris v. Maryland,* 908 F.2d 967 (4th Cir. 1990) (table opinion) ("A reading of the statute demonstrates that the Randolph–Sheppard Act mandates the exhaustion of the administrative remedies prior to instituting an action in the federal courts."); *Ala. Dept. of Rehab. Servs. v. U.S. Dep't of Veterans Affairs,* 165 F.Supp.2d 1262, 1269 (M.D.Ala. 2001) ("The Randolph–Sheppard Act's plain language does not expressly require exhaustion, but courts have construed the act's administrative framework to be mandatory.") (citing *Committee of Blind Vendors,* 28 F.3d at 134); *New York v. U.S. Postal Serv.,* 690 F.Supp. 1346, 1349 (S.D.N.Y.1988) (citing *Weinberger* as a "thorough and exhaustive opinion" whose "reasoning is persuasive," the court concluded that an argument in favor of voluntary arbitration was "less than compelling"); *Mass. Elected Committee of Blind Vendors v. Matava,* 482 F.Supp. 1186 (D.Mass.1980) ("The conclusion reached by the Sixth Circuit in *Fillinger* is a sound one.").

The *Weinberger* result also finds favor in the policies of judicial and administrative efficiency. "The reasons for making [administrative] procedures exclusive, and for the judicial application of the exhaustion doctrine in cases where the statutory requirement of exclusivity is not so explicit, are not difficult to understand." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). They are rooted in "the avoidance of premature interruption of the admin-

istrative process." *Id.* Similarly, there are the benefits of first allowing the agency to exercise its discretion and expertise, as may be called for in a particular issue. "The very same reasons lie behind judicial rules sharply limiting interlocutory appeals." *Id.* at 194, 89 S.Ct. 1657. Of additional consequence is the fact that an administrative agency "is created as a separate entity and invested with certain powers and duties." *Id.* The judiciary should ordinarily exercise restraint in entering into the province of the agency until such time as the agency has completed its own action or acted in such a manner as to necessitate judicial intervention. *Id.* It is in the interest of judicial efficiency to allow the machinery of agency action to proceed unobstructed where Congress has so desired, because issues may be resolved satisfactorily through the administrative process without ever requiring judicial intervention or attention. *Id.* at 195, 89 S.Ct. 1657. "Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *Id.*

KDB rejects the exhaustion analysis, concluding instead that Congress in fact created only a voluntary scheme of arbitration that is merely an alternative to available judicial remedies. The specific language of the RSA and its implementing regulations, KDB argues, "*allow for, but do not require,* a SLA to demand arbitration of an agency's failure to administer properly the RSA or its regulations." Pl.'s Mot. for Summ. J. at 18. This is the approach adopted previously by the Claims Court, albeit in *dicta,* in *Texas State Commission for the Blind v. United States,* 6 Cl.Ct. 730, 735–36 & n. 12 (1984), *rev'd on*

*other grounds,* 796 F.2d 400 (Fed.Cir.1986) (en banc). Nevertheless, given the strong rationale in favor of exhaustion stated above, and a number of deficiencies in the approach taken in *Texas State Commission* noted below, this court declines to follow that case as authority,[11] in favor of the far more persuasive rationale set out in *Weinberger.*

In *Texas State Commission,* the plaintiff state-licensing agency had sued for enforcement of an arbitration award previously entered pursuant to the RSA provisions. In a footnote, the court concluded that "[a]rbitration under the Randolph–Sheppard Act is voluntary," and had the plaintiff chosen *not* to arbitrate its dispute, it *could* have instituted its claim in the Court of Federal Claims. *Id.* Looking only to the language of the statute, the court was convinced that the contrast between the *permissive language* used in 20 U.S.C. § 107d–1(a) & (b) allowing a dissatisfied blind licensee or SLA to file a complaint with the Secretary ("*may* file a complaint") and the *mandatory language* requiring arbitration after such a request ("a full evidentiary hearing … *shall* be provided") indicated that it was "clear arbitration is not mandatory." *Id.*

Employing this literalistic textual approach—one persuasively rejected by *Weinberger*—the court wholly failed to construe the language in the broader context of the statute, and, therefore, its analysis is flawed. As Justice Brandeis observed, it is a "well settled" rule that "where a statute creates a right and provides a special remedy, that remedy is exclusive." *United States v. Babcock,* 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed.

---

11. Since the issue of exhaustion was not before the *Texas State Commission* court, it was not addressed by the Federal Circuit on appeal. *See Tex. State Comm'n for the Blind v. United States,* 796 F.2d 400 (Fed.Cir.1986) (en banc). Nevertheless, the Federal Circuit's opinion—even though it did not address jurisdiction—has been cited as authority (this court believes erroneously) by the Court of Federal Claims for jurisdiction over RSA challenges in at least one case. *See Wash. State Dep't of Servs. for the Blind v. United States,* 58 Fed.Cl. 781, 786 n. 8 (2003) ("The court believes that it has jurisdiction of this case under the Federal Circuit's decision in *Texas State Commission.*"). In other cases this court has simply assumed that jurisdiction existed over

RSA contract or bid protest actions absent exhaustion probably because neither of the parties raised the jurisdictional issue. *See Miss. Dep't of Rehab. Servs. v. United States,* 61 Fed.Cl. 20 (2004) (concluding that a Navy procurement for DFA services was subject to the RSA, but failing to address jurisdictional implications of the RSA arbitration procedures) (citing *Wash. State Dep't of Servs. for the Blind,* 58 Fed.Cl. at 786); *N.C. Div. of Servs. for Blind v. United States,* 53 Fed. Cl. 147 (2002) (concluding that a SLA lacked standing to challenge whether an Army procurement should have been subject to the RSA because the SLA's bid did not fall within the competitive range).

1011 (1919) (quoting *D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co.*, 236 U.S. 165, 174, 175, 35 S.Ct. 398, 59 L.Ed. 520 (1915); *Arnson v. Murphy*, 109 U.S. 238, 3 S.Ct. 184, 27 L.Ed. 920 (1883); *Barnet v. Nat'l Bank*, 98 U.S. 555, 558, 25 L.Ed. 212 (1878); *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. (1 Otto) 29, 35, 23 L.Ed. 196 (1875)). The court in *Texas State Commission* simply neglected to consider this rule.

Furthermore, *Texas State Commission's* reliance on *Oklahoma v. Weinberger*, 582 F.Supp. 293 (W.D.Okla.1982), *aff'd*, 741 F.2d 290 (10th Cir.1983), for support was misplaced. *See Tex. State Comm'n*, 6 Cl.Ct. at 736 n. 12. *Oklahoma* dealt with a unique situation in which the plaintiff had previously filed for RSA arbitration more than a year before filing the complaint. The DOE had not issued a decision within that period because the contracting agency had failed to participate in the arbitration process. The *Oklahoma* court characterized this failure as "recalcitrance" and the justification for establishing jurisdiction in the district court. *Oklahoma*, 582 F.Supp. at 294 n. 2. *Oklahoma* apparently relied on a narrow exception to the exhaustion requirement to establish jurisdiction, namely the futility exception.[12]

For the foregoing reasons, this court concludes that the statutory scheme of the RSA requires exhaustion of administrative procedures before an aggrieved SLA may raise an RSA claim in this court.

## D. *KDB's "Arising Under" Argument*

■ KDB maintains that its claim is not an "RSA claim" at all, and dismisses any jurisdictional challenge as "meritless." Pl.'s Mot. for Summ. J. at 16. It argues that the complaint does not "challenge the Army's administration or compliance with the RSA ... [or] raise any issue that Congress has

deemed pre-empted by the RSA or within the DOE's 'primary jurisdiction.'" *Id.* at 16–17. Rather, KDB argues that it challenges the Army's compliance with Federal procurement statutes and regulations (*e.g.*, 10 U.S.C. § 2305(b)(1) and FAR § 15.305, .306), "which ensure fair and impartial treatment of offerors and apply *regardless* of whether the Solicitation was subject to the RSA." *Id.* at 17 (emphasis in original). These provisions generally require an agency to comply with the terms of its solicitation in establishing its competitive range.

The gist of KDB's bid protest is that the Army failed to follow the terms of the solicitation and the federal regulations in setting the competitive range that excluded KDB. KDB alleges that the Army failed to consider all relevant information in evaluating its past performance, including several prior contracts completed by KDB and its subcontractors. Had the Army done so, KDB claims that it would have received a performance rating of Exceptional/No Risk instead of the Very Good/Low Risk rating that it and several other offerors ultimately received. *Id.* at 22–24. KDB also alleges that its rating was unreasonably low in comparison to those offerors in the competitive range, pointing to a host of defects or inconsistencies in the performance reviews that those offerors received. *Id.* at 24–26. Furthermore, KDB contends that its bid should have been included in the competitive range because it received the same Very Good/Low Risk past performance rating as the offerors in the competitive range, and the Contracting Officer should not have placed so much emphasis on the price of KDB's bid. *Id.* at 26–31.

By focusing on its exclusion from the competitive range, KDB asks the court to consider its claim not as an RSA grievance, but rather as a challenge entirely within the

---

12. *See, e.g., Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1575 (Fed.Cir.1990) ("Courts will, as a general rule, refuse to require administrative exhaustion when resort to the administrative remedy would be futile, including situations where plaintiffs would be 'required to go through obviously useless motions in order to preserve their rights.'") (quoting *Bendure v. United States*, 213 Ct.Cl. 633, 554 F.2d 427, 431 (1977)). The D.C. Circuit in

*Weinberger* criticized *Texas State Commission's* reliance on *Oklahoma* for the same reason: "The [*Oklahoma*] court appeared to rely on a proper application of the 'futility' exception to the exhaustion requirement—where resort to arbitration would be 'clearly useless' because the agency is unwilling, or as appeared there, unable because of another department's 'recalcitrance,' to consider the issue." *Weinberger*, 795 F.2d at 103 n. 21 (citations omitted).

Tucker Act's jurisdiction.[13] It bends over backward to argue that this grievance does not "arise under" the RSA, but rather deals with general principles of procurement law— namely, that the Army failed to follow the terms of its solicitation in evaluating KDB's proposal and ultimately excluding KDB from the competitive range. In styling its complaint as a challenge to procurement issues, KDB contends that "there is no provision in either the RSA or its regulations which supercedes, preempts, or varies the CICA and FAR requirements" governing an agency's evaluation of procurement proposals, and therefore the court should not address the claim in the context of the RSA. *Id.* at 18.

In support of its argument, KDB invokes *Washington State Department of Services for the Blind v. United States,* 58 Fed.Cl. 781 (2003), in which the Court of Federal Claims concluded that it had proper jurisdiction over the issue of whether the RSA was applicable to a solicitation. Pl.'s Mot. for Summ. J. at 20. Although there are facial similarities between *Washington State* and the matter at hand, the issues presented in that case do not comport with those with which the court grapples here.

In *Washington State,* the plaintiff filed a pre-award bid protest arguing that an Army procurement for DFA services (like those that the Army solicited in this case) should have been subject to the RSA, but was not. The plaintiff SLA sued in this court for a "Referral of Issues to the DOE," so that the DOE could properly determine whether the solicitation should have been subject to the RSA. *See Washington State,* 58 Fed.Cl. at 786. Unlike the jurisdictional exhaustion issue squarely facing this court in a post-contract award case, the issue facing the *Washington State* court was whether to apply the administrative law "primary jurisdiction" doctrine:

> Primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Id.* at 785 (quoting *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (alteration in original)). Ultimately, the court concluded that the determination to be made involved a "matter of statutory interpretation that falls within the conventional expertise of this court" and declined to refer the matter to the DOE. *Id.* at 787. Notably, however, the court only in passing addressed its own jurisdiction in light of the RSA's arbitration provisions. *See id.* at 786 n. 8 ("The parties have not challenged this court's jurisdiction to hear [plaintiff's] complaint notwithstanding RSA's provision of the administrative remedy of arbitration. The court believes that it has jurisdiction of this case under the Federal Circuit's decision in *Texas State Commission for the Blind v. United States,* 796 F.2d 400, 404 (Fed.Cir.1986) (en banc). The court notes, however, that the issue of jurisdiction was not a focus of the Federal Circuit's opinion .... In some other cases which have turned on the question of exhaustion of administrative remedies under the RSA, courts have found exhaustion to be required.").

A second notable difference between this case and *Washington State* is the respective procedural frameworks and desired remedies. *Washington State* involved a pre-award bid protest in which the plaintiff merely sought a decision on whether the solicitation was subject to the RSA; presumably, an affirmative decision would have altered the manner in which the Army conducted that particular procurement going forward (*i.e.,* it would have conducted it pursuant to the RSA provisions). Here, however, the solicitation explicitly provided that it was indeed subject to the RSA, *see* Admin. R. at 369, ¶ 8 & 380, ¶ 3, and KDB filed a post-award bid protest that seeks an order directing the Army to set aside its previous award under this contract,

---

13. *See* 28 U.S.C. § 1491(b)(1) (noting that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement").

based on a finding that the Army's procedures did not comply with "the solicitation requirements and the RSA." Compl. at 17. This latter distinction is very important because it implicates various concerns.

One involves KDB's somewhat creative argument—that because it is the procurement award process that is challenged the claim becomes by definition a Tucker Act bid protest action and the RSA priority only kicks in after the procurement award issues are resolved.[14] But this argument misses the mark. Were the court to address KDB's claim on the merits, it may have no alternative but to construe the applicable RSA provisions and regulations promulgated thereunder to determine whether to enforce the Act's priority mandate. Simply put, a court ruling here on the competitive range and other procurement award issues could potentially become intertwined with the RSA's priority scheme, the applicability of which Congress intended the arbitration panel to initially determine. The claim brought by KDB, a RSA state agency for the blind, therefore, ought to be submitted to the DOE's arbitration panel in its entirety despite the fact that general matters of procurement law may be involved which might, hypothetically, resolve the dispute without reference to the RSA's priority scheme. "Surely Congress contemplated that disputes between state agencies and government agencies could involve contract awards, such as the one at issue here. Congress nevertheless set up an arbitration scheme instead of authorizing direct resort to federal court." *Weinberger*, 795 F.2d at 103; *see also Fillinger*, 587 F.2d at 338 ("Congress' decision to provide administrative and arbitration remedies for aggrieved blind vendors clearly evidences a policy judgment that the federal courts should not be the tribunal of first resort for the resolution of such grievances.").

It is doubtful, however, whether procurement award issues exist that are truly independent of the Act. It is critical to emphasize that this conclusion emanates from the wording of the relevant provision of the Randolph–Sheppard Act which vests the Secretary of Education with the exclusive authority to resolve a SLA complaint when "any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder ...." 20 U.S.C. § 107d–1(b). Surely this very broad language encompasses all federal agency actions that have a reasonable nexus to the Act, which beyond a doubt would include a challenge to any agency decision to reject a proposal in response to a solicitation involving (in the term of the Act) the "operation" of a vending facility. *See Weinberger*, 795 F.2d at 103 ("... Congress contemplated that disputes between state agencies and government agencies could involve contract awards ....").

Furthermore, all the procurement issues in KDB's challenge to the contract award relate in one way or the other to KDB's exclusion from the competitive range. The court notes that the competitive range requirement was placed in the solicitation solely because it was believed that KDB, and possibly other SLAs, would participate. *See* Def.'s Mot. to Dismiss at 11–13 (noting that, aside from the RSA requirements, "[t]he contracting officer had no other reason to establish a competitive range" because this procurement did not require discussions); 48 C.F.R. § 15.306(c) ("*[I]f discussions are to be conducted*," then "Agencies shall ... establish the competitive range.") (emphasis added); Admin. R. at 458. To be sure, the competitive range requirement in the solicitation was the result of the

14. During the hearing on the parties' cross-motions for summary judgment, KDB argued:

> PLAINTIFF'S COUNSEL: ... Once we get in the competitive range, Your Honor, the priority kicks in and we automatically have the priority and are entitled to the award under the regulations. So the only thing we need to do is get in the competitive range.

> THE COURT: See, that's the problem that I have, because, once you start arguing priority, you are back in the Randolph–Sheppard Act. It becomes a Randolph–Sheppard Act case.
> PLAINTIFF'S COUNSEL: That's right. But we only get to the Randolph–Sheppard issue once we resolve the procurement issue ....
> July 20, 2004 Hearing Tr. at 26–28.

DOE regulation requiring agencies to establish a competitive range in vending facility contracts, see 34 C.F.R. § 395.33(b), which became part of the solicitation pursuant to the corresponding Army regulation. See Army Reg. 210–25. Consequently, the issue of whether KDB falls within the competitive range cannot be said to be purely a procurement award issue exclusively within the Tucker Act jurisdiction of this court because this issue arose out of an alleged failure "to comply with the provisions of this chapter [of the Randolph–Sheppard Act] or *any regulations issued thereunder* ...." 20 U.S.C. § 107d–1(b) (emphasis added). This requires exhaustion of the arbitration remedy before seeking a judicial remedy. *Id.; see Weinberger*, 795 F.2d at 103; *Fillinger*, 587 F.2d at 338.

### E.  *Adequacy of the Arbitration Remedy*

KDB argues that the remedy available through the RSA's arbitration procedure is inadequate because the arbitration panel is "authorized only to decide whether the challenged entity was in violation of the RSA and ... such panel [has] no authority to prescribe or order a remedy should such entity be found in violation of the Act." Pl.'s Mot. for Summ. J. at 19 (citing *Md. Dep't of Educ. v. United States*, 98 F.3d 165 (4th Cir.1996)). Presumably, KDB fears that the arbitration panel will not be able to effectuate an adequate or timely remedy to correct the Army's alleged non-compliance with the RSA. This argument, however, is based on an erroneous interpretation of *Maryland Department of Education*.

In that case, the Fourth Circuit considered whether the DOE arbitration panel had authority to compel the Department of Veterans Affairs to comply with an order dictating specific remedial measures that the agency should carry out in order to comply with the RSA. The panel had ordered the agency to turn over both the operation of a specific

retail space and certain fixtures and equipment to the petitioning SLA. *Md. Dep't of Educ.*, 98 F.3d at 168. The agency instead offered the SLA an alternative vending facility which the SLA rejected, and the SLA then sued in district court for an order requiring the agency to comply with the arbitration panel's award. *Id.* The court concluded that the arbitration panel did not have statutory authority to order an agency to take specific remedial steps to comply with the RSA. *Id.* The court noted, however, that the arbitration panel itself is vested by statute with the authority to determine whether the acts of a federal entity "are in violation" of the substantive provisions of the RSA.[15]

The arbitration scheme, therefore, envisions the DOE panel to be able to, in effect, order an agency to take sufficient steps to bring its actions in compliance with the RSA if the panel concludes that the agency has run afoul of the Act's provisions. *Id.* This certainly would include ordering the Army to set-aside the contract and re-bid the solicitation according to the proper standards required by law, which would include establishing a proper competitive range, the very relief KDB seeks from this court.

Finally, another concern KDB raises is based on legitimate public policy grounds, the prospect of inconsistent results should a SLA and a non-SLA offeror protest the same award in different fora. Pl.'s Mot. Summ. J. at 20–21. For example, KDB argues that a non-SLA offeror could "fast-track" its protest through the Court of Federal Claims while the SLA would first need to submit to arbitration before seeking judicial review. *Id.* at 21. While an arbitration panel could rule in favor of an SLA, the Court of Federal Claims may find in favor of the non-SLA offeror or even the agency. In other words, "[t]he agency could prevail in one proceeding but not the other, which might place it in the position of violating a decision by this court in its effort to comply with the decision of the

---

**15.** The arbitration provision of the RSA provides that:

> If the panel appointed pursuant to paragraph (2) finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, *the head of any such depart-*

*ment, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.* 20 U.S.C. § 107d–2(b)(2) (emphasis added); *see also Md. Dep't of Educ.*, 98 F.3d at 169.

arbitration panel ir *vice versa.*" *Id.* This scenario, contends KDB, places an SLA at a distinct disadvantage, precluding it from exercising the "same rights and remedies as every other offeror." Tr. of Oral Arg. at 17:10–11.

While this argument raises a valid concern, it is inherent in the current statutory framework and is beyond the power of this court to correct. Instead, it reflects a policy judgment of Congress, the branch of government the Constitution vests with the authority to balance through legislative enactments the institutional, social, and economic interests of various constituencies. This authority the courts may not usurp. *See Fillinger,* 587 F.2d at 338.

### V.  Conclusion

For the foregoing reasons, this court **GRANTS** the defendant's motion to dismiss for lack of jurisdiction. The complaint is hereby **DISMISSED. NO COSTS.**

**IT IS SO ORDERED.**